#26213-a-DG

**2012 S.D. 60**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                                    Plaintiff,

    v.

ERIC DONALD ROBERT,                                       Defendant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT
SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE BRADLEY G. ZELL
Judge

\* \* \* \*

MARTY J. JACKLEY
Attorney General

PAUL S. SWEDLUND
Assistant Attorney General
Pierre, South Dakota                          Attorneys for plaintiff.

MARK KADI
Minnehaha County Public Advocates
Sioux Falls, South Dakota                     Attorneys for defendant.

RANDAL E. CONNELLY
Rapid City, South Dakota                      Amicus Curiae.

\* \* \* \*

CONSIDERED ON BRIEFS
ON JULY 31, 2012

OPINION FILED  **08/15/12**

#26213

GILBERTSON, Chief Justice

[¶1.]          Eric Robert pleaded guilty to first-degree murder for the death of

penitentiary guard Ronald Johnson, a 23-year veteran correctional officer at the

South Dakota State Penitentiary in Sioux Falls.  Robert waived his right to a jury's

determination of whether the death sentence would be imposed.  The circuit court

conducted a pre-sentence hearing and imposed the death penalty.  Subsequent to

pleading guilty, Robert has consistently sought imposition of the death penalty and

that the execution be expedited.  Even though Robert waived his right to appeal the

death sentence, this Court is statutorily mandated to conduct a review of the death

sentence.  SDCL 23A-27A-9.

Facts

[¶2.]          Robert was convicted of kidnapping in Meade County in January 2006.

The Meade County Circuit Court sentenced him to 80 years in prison.  This

conviction resulted in Robert being incarcerated in the South Dakota State

Penitentiary beginning in January 2006.

[¶3.]          On April 12, 2011, Robert and Rodney Berget, also an inmate at the

South Dakota Penitentiary, entered the Pheasantland Industries' building[1] in the

penitentiary complex.[2]  Because of their maximum security classifications, neither

inmate was authorized access to this building.  On this date, Johnson was working

1.    Pheasantland Industries is an enterprise within the walls of the State
      Penitentiary.

2.     A separate appeal is currently pending in this Court in regard to Berget.  *See*
      *State v. Berget*, #26318.  We limit our factual review in this case to the record
      contained herein.  *See also* n.13.

-1-

in the Pheasantland Industries' building. Robert and Berget assaulted Johnson by striking him with a lead pipe which they had acquired earlier specifically for that purpose. Johnson was repeatedly struck on the face and head with the lead pipe. An expert testified that the blows to the head continued after Johnson was on the ground. The attack fractured Johnson's skull in at least three locations and exposed a portion of his brain. He also suffered defensive wounds to his hands and arms. After immobilizing Johnson with the pipe, Robert and Berget wrapped Johnson's head in plastic wrap which prevented him from crying out and also from breathing. The inmates dragged Johnson's body behind a large crate to conceal him.

[¶4.] Robert then dressed himself in Johnson's uniform and Berget climbed into a box placed on a four-wheel cart. Robert, dressed as Johnson, pushed the cart toward the west gate of the penitentiary. After observing that Robert did not swipe an ID badge, Correctional Officer Jodi Hall confronted Robert about his identity. When Robert's explanation did not satisfy her, Hall notified Officer Matt Freeburg. Freeburg told Hall to call the Officer in Charge. At this time, Berget sprang from the box and he and Robert began assaulting Freeburg. The inmates used Johnson's radio to beat Freeburg. Hall issued a distress call "Code Red – Code 3" on her radio. While Berget continued the assault on Freeburg, Robert attempted to scale the exterior gate of the penitentiary but became entangled in razor wire. Robert then attempted to grab a gun from the responding officers. When that did not work, Robert and Berget tried to bait the officers into shooting them. Unsuccessful and surrounded, Robert shook Berget's hand and the pair surrendered.

[¶5.]     Because Robert was wearing Johnson's uniform, penitentiary staff began to search for Johnson. His body was discovered behind the crate in the Pheasantland Industries' building. His face was badly disfigured and swollen from the beating and asphyxiation. The correctional officer who found Johnson attempted CPR. Life-saving efforts continued after medical personnel arrived and on the way to the hospital, but all efforts proved futile. Johnson was declared dead at the hospital.

## Procedural History

[¶6.]     On September 16, 2011, Robert pleaded guilty to first-degree murder in violation of SDCL 22-16-1(1), 22-16-4(1), 22-16-12, and 22-3-3. Robert waived his right to a jury sentencing. The circuit court found Robert competent, that he was represented by competent counsel, and that the plea and jury waiver were entered voluntarily, knowingly, and intelligently.

[¶7.]     Pursuant to South Dakota's statutes, a death penalty prosecution is conducted in two phases. *See* SDCL 23A-27A-2. The first phase adjudicates the defendant's guilt or innocence. *Id*. If a guilty verdict is returned, the trial is resumed "to hear additional evidence in mitigation and aggravation of punishment." *Id*. Because Robert pleaded guilty, there was no trial on the guilt phase. Moreover, because he waived his right to jury sentencing, the penalty phase was tried to the circuit court.

[¶8.]		In order for the death penalty to be considered, the State must prove at

least one of the aggravating circumstances enumerated in SDCL 23A-27A-1[3]

---

3.	This section provides:

> Pursuant to §§ 23A-27A-2 to 23A-27A-6, inclusive, in all cases for which the death penalty may be authorized, the judge shall consider, or shall include in instructions to the jury for it to consider, any mitigating circumstances and any of the following aggravating circumstances which may be supported by the evidence:
>
> (1)	The offense was committed by a person with a prior record of conviction for a Class A or Class B felony, or the offense of murder was committed by a person who has a felony conviction for a crime of violence as defined in subdivision 22-1-2(9);
>
> (2)	The defendant by the defendant's act knowingly created a great risk of death to more than one person in a public place by means of a weapon or device which would normally be hazardous to the lives of more than one person;
>
> (3)	The defendant committed the offense for the benefit of the defendant or another, for the purpose of receiving money or any other thing of monetary value;
>
> (4)	The defendant committed the offense on a judicial officer, former judicial officer, prosecutor, or former prosecutor while such prosecutor, former prosecutor, judicial officer, or former judicial officer was engaged in the performance of such person's official duties or where a major part of the motivation for the offense came from the official actions of such judicial officer, former judicial officer, prosecutor, or former prosecutor;
>
> (5)	The defendant caused or directed another to commit murder or committed murder as an agent or employee of another person;
>
> (6)	The offense was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim. Any murder is wantonly vile,

(…continued)

beyond a reasonable doubt. SDCL 23A-27A-6.[4] Should at least one aggravating circumstance be proven, the death penalty can be considered. *Id*. At the pre-sentence hearing, defendants are allowed to present whatever relevant mitigating evidence they can muster. SDCL 23A-27A-2.

[¶9.]        Robert's pre-sentence hearing began on October 24, 2011, and lasted four days. Following the hearing, the circuit court entered extensive findings of fact and conclusions of law. The circuit court found that the State proved beyond a

_____

(…continued)

> horrible, and inhuman if the victim is less than thirteen years of age;
>
> (7)      The offense was committed against a law enforcement officer, employee of a corrections institution, or firefighter while engaged in the performance of such person's official duties;
>
> (8)      The offense was committed by a person in, or who has escaped from, the lawful custody of a law enforcement officer or place of lawful confinement;
>
> (9)      The offense was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or custody in a place of lawful confinement, of the defendant or another; or
>
> (10)     The offense was committed in the course of manufacturing, distributing, or dispensing substances listed in Schedules I and II in violation of § 22-42-2.

4.      This section provides:

> In nonjury cases the judge shall, after conducting the presentence hearing as provided in § 23A-27A-2, designate, in writing, the aggravating circumstance or circumstances, if any, which he found beyond a reasonable doubt. Unless at least one of the statutory aggravating circumstances enumerated in § 23A-27A-1 is so found, the death penalty shall not be imposed.

reasonable doubt the existence of two aggravating circumstances: "the offense was committed against a law enforcement officer, employee of a corrections institution, or firefighter while engaged in the performance of such person's official duties," and "the offense was committed by a person in, or who has escaped from, the lawful custody of a law enforcement officer or place of lawful confinement." SDCL 23A-27A-1(7), (8). Although evidence had been presented regarding several other aggravating circumstances, the circuit court found it unnecessary to make further findings regarding any other aggravating circumstances. Because at least one of the enumerated aggravating circumstances had been proven, the circuit court concluded that consideration of the death penalty was appropriate.

[¶10.]    The circuit court then turned to its consideration of the aggravating and mitigating evidence presented. *See* SDCL 23A-27A-2.[5] The court began this

_____

5.    This section provides:

> In all cases in which the death penalty may be imposed and which are tried by a jury, upon a return of a verdict of guilty by the jury, the court shall resume the trial and conduct a presentence hearing before the jury. Such hearing shall be conducted to hear additional evidence in mitigation and aggravation of punishment. At such hearing the jury shall receive all relevant evidence, including:
>
> (1)    Evidence supporting any of the aggravating circumstances listed under § 23A-27A-1;
>
> (2)    Testimony regarding the impact of the crime on the victim's family;
>
> (3)    Any prior criminal or juvenile record of the defendant and such information about the defendant's characteristics, the

(…continued)

analysis by noting Robert's intent and desire to die. The court concluded that such a wish is not an aggravating circumstance appropriately considered in the determination of whether the death penalty should be imposed. The court also noted that Robert had instructed his counsel not to present mitigating evidence on his behalf. However, the court indicated that it considered all mitigating evidence contained in the record. This mitigating evidence included Robert's acceptance of responsibility and mitigating evidence from the Meade County kidnapping file, of which the court took judicial notice. After considering both the aggravating and mitigating evidence, the court concluded that "the only effective and reasonable retribution or punishment under the totality of the circumstances in this matter is the imposition of the death penalty."

[¶11.] The circuit court entered a Judgment of Conviction and Warrant of Execution on November 10, 2011. On November 16, 2011, Robert filed a Waiver of Appeal, waiving his right to appeal his conviction. This waiver acknowledged his right to appeal, acknowledged discussing his waiver with counsel, and stated that the waiver was free and voluntary. The waiver was signed by Robert and was notarized.

[¶12.] Regardless of Robert's waiver of appeal, this Court is obligated to review each death sentence imposed in South Dakota. "If the death penalty is

_____

(…continued)

> defendant's financial condition, and the circumstances of the defendant's behavior as may be helpful in imposing sentence;

> (4) All evidence concerning any mitigating circumstances.

imposed, and if the judgment becomes final in the trial court, the sentence shall be reviewed on the record by the South Dakota Supreme Court." SDCL 23A-27A-9. This Court conducts this review whether or not the defendant appeals the sentence. When the defendant appeals, this Court's statutorily obligated sentence review is consolidated with the direct appeal. *Id.* This Court obtained jurisdiction to conduct this sentence review when the circuit court clerk transmitted the record, transcripts, a prepared notice of the clerk, and report of the trial judge to this Court.[6] *See id.*

[¶13.]     Upon obtaining jurisdiction, Robert's position raised with this Court an issue of first impression. It was clear to the Court that Robert had instructed his appointed counsel to make no argument against imposition of the death penalty. This Court is aware of society's interest in the constitutional imposition of the death penalty. *See Commonwealth v. McKenna*, 383 A.2d 174, 181 (Pa. 1978). This

---

6.     Robert's position in this matter raised procedural issues as of yet unique to this State's death penalty procedure. Pursuant to SDCL 23A-27A-9, the circuit court clerk is to transmit the entire record and transcript to this Court in order to effectuate the mandatory sentence review. The time for transmittal of the record from the circuit court to this Court hinges upon completion of the transcripts. Because Robert chose not to appeal, he did not order transcripts in connection with his notice of appeal. However, transcripts needed to be ordered and completed both to effectuate this Court's sentence review and to commence the time for transmittal of the record from the circuit court to this Court. The circuit court, appropriately relying on SDCL 23A-32-1, issued an order directing the court reporters involved to prepare transcripts and charge the expense to the County. Completion and filing of the transcripts provided this Court with a complete record on which to conduct this mandatory sentence review and triggered the procedural mechanism for initiating that review when no notice of appeal was filed by Robert.

interest exists independent of the State's interest in punishing Robert for his crimes. Aware that Robert's instructions prevented his appointed counsel from arguing against imposition of the death penalty and that the State would be arguing for imposition of the death penalty, this Court appointed an experienced criminal trial attorney as amicus curiae to identify and raise any potential issues not presented due to the respective positions of Robert and the State.[7]

[¶14.]     Additionally, Robert's position called into question his competency–especially his competency to waive presentation of mitigating evidence at the pre-sentence hearing and urge his own execution. The record revealed that Dr. Manlove, a psychiatrist, had evaluated Robert for the purpose of determining his competency to stand trial.[8] While it was clear that Dr. Manlove concluded Robert was competent to stand trial, Robert had prevented either the State or the circuit

---

7.     Given Robert's position of seeking the death penalty, this Court concluded it was appropriate to appoint an amicus curiae to act as an independent "friend of the Court" to call to this Court's attention any issues which are relevant to its statutory and constitutional independent review of this case. The amicus did appropriately function in this manner.

> [T]he term "amicus curiae" literally means "a friend of the court." It ordinarily implies the friendly intervention of counsel to call the court's attention to a legal matter which has escaped or might escape the court's consideration. The right to be so heard is entirely within the court's discretion. . . . He cannot be partisan. Neither can he be a party nor assume the functions of a party to an action.

*Matter of Estate of Ohlhauser*, 78 S.D. 319, 322-3, 101 N.W.2d 827, 829 (1960).

8.     Dr. Manlove had also evaluated Robert in connection with the Meade County proceedings.

court from reviewing Dr. Manlove's report. At that point, Robert had sole access to the report and refused to release it to the circuit court or to the State. Given the gravity of the issues and potential outcome, this Court, sua sponte, requested the parties address the issue of Robert's competency. Specifically, this Court requested the parties' analysis of the appropriate competency standard, and whether Robert gave any indication of failing that standard. All parties, including the amicus curiae, agreed that the record revealed no concern as to Robert's competency. The circuit judge had found Robert competent, and Robert's in-court statements throughout the circuit court proceedings were those of a competent, intelligent man. Nevertheless, out of an abundance of caution, this Court accepted Robert's offer to review in-camera the Manlove report completed after Robert chose to plead guilty. The contents of this report, which remain under seal, alleviate our concerns regarding Robert's competency.

[¶15.] With amicus appointed and Robert's competency settled, this Court entered an order setting a briefing schedule. Further, we ordered Robert's execution stayed until such time as this sentence review was completed. Robert strenuously objected to the briefing schedule and the resultant delay of his execution, arguing that this Court was without jurisdiction to stay his execution absent a direct appeal. We addressed Robert's objections in an earlier opinion. *State v. Robert*, 2012 S.D. 27, 814 N.W.2d 122. We determined that this Court has jurisdiction to stay Robert's execution pending our review. *Id*. This Court having

received the briefs of Robert, the State, and amicus curiae, now proceeds to review

Robert's sentence.[9]

Analysis

[¶16.] Regardless of whether a direct appeal is filed by a defendant, this

Court is obligated to review each sentence of death imposed in this state. "If the

death penalty is imposed, and if the judgment becomes final in the trial court, the

sentence shall be reviewed on the record by the South Dakota Supreme Court."

SDCL 23A-27A-9. This Court is required to make certain enumerated inquiries

regarding each death sentence.

> With regard to the sentence, the Supreme Court shall
> determine:
>
> (1) Whether the sentence of death was imposed under the
> influence of passion, prejudice, or any other arbitrary factor; and

---

9. Robert and the State both waived oral argument in this matter. As the parties' respective briefs illustrated no difference in their positions on the statutorily mandated areas of inquiry, we accepted the waiver and review Robert's sentence on the record presented. This should not be understood as rendering our review of Robert's death sentence cursory. As we have recognized: "This is in keeping with the mandate of the Supreme Court that we must review carefully and with consistency death penalty cases and not engage in 'cursory' or 'rubber stamp' type of review." *State v. Piper*, 2006 S.D. 1, ¶ 83, 709 N.W.2d 783, 815 (quoting *Arizona v. Watson*, 628 P.2d 943, 946 (1981)). *See also Piper v. Weber* (*Piper II*), 2009 S.D. 66, ¶ 6, 771 N.W.2d 352, 355 ("'The penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two.' *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S. Ct. 2978, 2991, 49 L. Ed. 2d 944 (1976). 'The qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination.' *California v. Ramos*, 463 U.S. 992, 998-99, 103 S. Ct. 3446, 3452, 77 L. Ed. 2d 1171 (1983)").

(2)     Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in § 23A-27A-1; and

(3)     Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

SDCL 23A-27A-12.  We address each inquiry in turn.

[¶17.]     **(1)     Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.**

[¶18.]     The pre-sentence verdict illustrates the circuit court's thought process in reaching its sentencing conclusion.  The conclusion was based on appropriate considerations including: Robert's future dangerousness, including his threat to kill again; his violent history, including the 2005 kidnapping; his ability to be rehabilitated; and the severity and depravity of the crime.  The court also considered any mitigating evidence it could find, despite Robert's desire that no such evidence be presented.  None of the considerations articulated as factoring into the sentencing decision evidence the influence of passion, prejudice, or any other arbitrary factor.

[¶19.]     Perhaps the obvious manner in which Robert fights so vigorously for his execution calls us to review the propriety of it.  Robert's passion toward this end generates an examination of the manner in which the sentence was imposed.  Robert's persistent efforts to hasten his own death necessitate intense scrutiny to guarantee his desire to die was not a consideration in the sentencing determination.  We do not participate in a program of state-assisted suicide.  "The State must not become an unwitting partner in a defendant's suicide by placing the personal

-12-

desires of the defendant above the societal interests in assuring that the death penalty is imposed in a rational, non-arbitrary fashion." *Grasso v. State*, 857 P.2d 802, 811 (Okla. Crim. App. 1993) (Chapel, Judge, concurring). Indeed, had the sentencing determination been based in any degree on Robert's desire to die, the sentence may have been impermissibly imposed based on a non-statutory arbitrary factor—Robert's suicide wish. *See Lenhard v. Wolff*, 444 U.S. 807, 815, 100 S. Ct. 29, 33 (1979) (Marshall, J., dissenting). If that were the case, and the record revealed that the circuit court based its decision on Robert's desire to die, this Court would be obligated to reverse the sentence of death and remand for resentencing. *See* SDCL 23A-27A-13. It is not a statutory aggravating circumstance to invoke the death penalty. *See* SDCL 23A-27A-1. However, the circuit court went out of its way to make it clear that the sentencing decision was based in no part on Robert's desire to die. This Court can affirm the constitutional imposition of the death penalty imposed in accordance with our statutes; it will not sanction state-assisted suicide.

[¶20.] As noted above, Robert waived presentation of mitigating evidence at the pre-sentence hearing. The circuit court recognized Robert's right to do so. *Schriro v. Landrigan*, 550 U.S. 465, 479, 127 S. Ct. 1933, 1942, __ L. Ed. 2d __ (2007). The circuit court in *Schriro* engaged the defendant in an on-the-record colloquy regarding his waiver of presentation of mitigating evidence. *Id.* at 469, 127 S. Ct. at 1937. Here, the record presents no such on-the-record colloquy specifically relating to Robert's waiver of mitigating evidence. However, the Supreme Court indicated in *Schriro* that such a colloquy had never been required. *Id.* at 479, 127 S. Ct. at 1943. It also indicated that an "informed and knowing" standard for waiving

-13-

mitigating evidence had not been established, but it assumed that one existed. *Id.* at 479, 127 S. Ct. at 1942. While it may be better practice to conduct an on-the-record colloquy with a capital defendant choosing to waive mitigating evidence, the record supports the conclusion that, assuming an "informed and knowing" standard applies to such a waiver, Robert's waiver satisfied that standard.

[¶21.] Recognizing that Robert had a right to waive presentation of mitigating evidence, the circuit court considered mitigation from whatever source it could find. SDCL 23A-27A-1 requires that the judge "shall consider . . . any mitigating circumstances." *Piper*, 2006 S.D. 1, ¶ 32, 709 N.W. 2d at 799 (also citing *Lockett v. Ohio*, 438 U.S. 586, 604-05, 98 S. Ct. 2954, 2964-65, 57 L. Ed. 2d 973 (1979)). Despite Robert's waiver, the circuit court's consideration of "any mitigating circumstances" was required. This the circuit court did. Robert's death sentence does not appear to have been the result of passion, prejudice, or any other arbitrary factor.

[¶22.] **(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in § 23A-27A-1.**

[¶23.] The circuit court found that the State had proven the existence of two of the aggravating circumstances enumerated in SDCL 23A-27A-1.[10] Specifically, the court found the existence of circumstance 7: "The offense was committed against a law enforcement officer, employee of a corrections institution, or firefighter while engaged in the performance of such person's official duties;" and circumstance 8:

---

10. "We have previously held the aggravating factors under SDCL 23A-27A-1 to be constitutional." *Piper*, 2006 S.D. 1, ¶ 28, 709 N.W.2d at 783.

"The offense was committed by a person in, or who has escaped from, the lawful custody of a law enforcement officer or place of lawful confinement."

[¶24.] The evidence presented at the pre-sentence hearing included testimony from Douglas Weber, Director of Adult Corrections and Chief Warden for the State of South Dakota. He testified that on April 12, 2011, Ronald Johnson was employed as a corrections officer at the South Dakota Penitentiary. He also testified that, at the time of the murder, Johnson was on duty in the Pheasantland Industries' building, covering a shift for a different corrections officer's absence. The evidence presented supports the finding of the aggravating circumstance identified in SDCL 23A-27A-1(7).

[¶25.] The record also contains the testimony of Jodi Hall and Matt Freeburg from the pre-sentence hearing. These two officers described the situation they encountered on April 12, 2011. Officer Hall described Robert's actions as he approached the penitentiary gate, dressed as Johnson. She also described Robert's attempt to climb through the razor wire on top of the gate after she called for the Officer in Charge to come to the location. Officer Hall testified: "Mr. Robert and Berget were attempting to escape."[11]

[¶26.] Officer Freeburg also described the events of April 12, 2011. Officer Freeburg testified that Robert assaulted him, then attempted to climb the gate. The evidence presented supports the finding of the aggravating circumstance found

---

11. SDCL 22-11A-1 defines escape as the "departure [by a prisoner] without lawful authority. . . ." SDCL 22-11A-2 provides, in relevant part, Escape in the First Degree to be "if the prisoner effects the escape. . . . (2) From a secure correctional facility. . . ."

in SDCL 23A-27A-1(8).[12]  In *Piper*, "we acknowledge[d] that once aggravating

circumstances have been proven beyond a reasonable doubt, the lower court has

broad discretion in determining whether to sentence a particular defendant to

death."  2006 S.D. 1, ¶ 28, 709 N.W.2d at 798.

[¶27.]     **(3)   Whether the sentence of death is excessive or
                   disproportionate to the penalty imposed in similar cases,
                   considering both the crime and the defendant.**

[¶28.]     The final inquiry regarding Robert's death sentence is the

proportionality of the sentence compared to the penalty imposed in similar cases.

This Court is obligated "to include in its decision a reference to those similar cases

which it took into consideration."  SDCL 23A-27A-13.  We clarified the "universe" of

cases to be considered in conducting this review in *Rhines I*.

> We conclude that similar cases for purposes of SDCL 23A-27A-
> 12(3) are those cases in which a capital sentencing proceeding
> was actually conducted, whether the sentence imposed was life
> or death.  "Because the aim of proportionality review is to
> ascertain what other capital sentencing authorities have done
> with similar capital murder offenses, the only cases that could
> be deemed similar . . . are those in which imposition of the death
> penalty was properly before the sentencing authority for
> determination."

*State v. Rhines* (*Rhines I*), 1996 S.D. 55, ¶ 185, 548 N.W.2d 415, 455-56 (quoting

*Tichnell v. State*, 297 Md. 432, 468 A.2d 1, 15-16 (1983) (citation omitted)).

[¶29.]     In *Piper*, 2006 S.D. 1, ¶ 38, 709 N.W.2d at 801, and *State v. Page*, 2006

S.D. 2, ¶ 60, 709 N.W.2d 739, 760-61, we identified those cases up to that point

---

12.   Furthermore, Robert admitted the existence of these two aggravating
      circumstances.  All other evidence is consistent with that admission so as not
      to taint his admission by his admitted goal of seeking the death penalty.

falling into this category. Since that time, our records reflect that, other than Robert, and now Berget[13], there has been one case in which a capital sentencing proceeding was conducted—*State v. Daphne Wright*. *See State v. Wright*, 2009 S.D. 51, 768 N.W.2d 512. In *Wright*, a Minnehaha County jury, faced with the decision of whether to impose the death penalty, chose life in prison. Therefore, we compare Robert's sentence with those cases identified in *Piper* and *Page*, as well as *Wright*.[14] As we did in *Page* and *Piper*, we take judicial notice of the summaries of the cases set forth in *Rhines I*, 1996 S.D. 55, ¶ 196, 548 N.W.2d at 456-57.

13.   As previously noted, Berget's case is pending before this Court for review in a separate proceeding. *See State v. Berget*, #26318. We do not engage in a comparison of the *Robert* and *Berget* cases at this point as Berget's appeal is still pending before this Court. As such, it is not a final decision of this Court appropriate for proportionality analysis. Moreover, Berget is contesting whether his actions justify a sentence of death on a proportionality basis. In part, he specifically relies upon a direct comparison between himself and Robert. To engage in such a joint analysis at this point could taint Berget's right to fully argue the same issue on his behalf based upon the record in his case at the point when his case is ready to be considered by this Court rather than the record in the *Robert* case now before us.

Although *Page* and *Piper* were considered and decided simultaneously, we limited ourselves to an examination of the individual record in each case when considering the statements of each defendant as to the facts of the homicide and culpability of each. *See Page*, 2006 S.D. 2, ¶ 110, 709 N.W.2d at 775; *Piper,* 2006 S.D. 1, ¶ 86, 709 N.W.2d at 815.

14.   The universe of cases in which a capital sentencing proceeding was conducted includes: *State v. Howard Adams*; *State v. Steven Bittner*; *State v. William J. Helmer*; *State v. Donald Moeller*; *State v. James Elmer Smith*; *State v. Edwin Swallow*; *State v. David Waff*; *State v. Charles Russell Rhines*; *State v. Robert Leroy Anderson*; *State v. Darrell Hoadley*; *State v. Elijah Page*; *State v. Briley Piper*; and *State v. Daphne Wright*. Moving forward, the universe will include *State v. Eric Robert* and *State v. Rodney Berget*.

[¶30.] Of these cases, the sentencing authority imposed the death sentence on six individuals (Moeller, Rhines, Anderson, Page, Piper, and Berget) and life without parole on the other eight. For purposes of comparative proportionality review, "a death sentence is comparatively excessive if other defendants with similar characteristics generally receive sentences other than death for committing factually similar offenses in the same jurisdiction." *Rhines I*, 1996 S.D. 55, ¶ 205, 548 N.W.2d at 457 (quoting *State v. Bey*, 645 A.2d 685, 689 (N.J. 1994)). Proportionality review focuses on both the crime and the defendant. *Id.* ¶ 206. We have recognized that "the disparity in suffering endured by victims is an important and legitimate consideration when evaluating the proportionality of a death sentence." *Id.* ¶ 207.

[¶31.] As this is the first time this Court has included the case of Daphne Wright in its proportionality review of a death sentence, a summary is appropriate. Fueled by jealousy, Wright murdered a friend of her girlfriend by beating her to death with a blunt object. The victim was also asphyxiated. Wright then attempted to secrete the crime by cutting the victim's body into pieces and disposing of the parts in several places. The State sought the death penalty based on the depravity of the crime. The evidence at trial established that the victim's body was dismembered post-mortem. The jury heard that Wright is deaf and that she was traumatized when her parents sent her to a boarding school for the deaf at age five. A psychological evaluation gauged Wright's reading comprehension at a third-grade level, and found that she may have suffered brain damage from an infant illness

that caused her deafness. Wright's mitigating evidence also included struggles with her sexual identity and multiple suicide attempts.

[¶32.] Wright's crime factually resembles Johnson's death. Wright beat her victim to death with a blunt object then asphyxiated her. The State sought the death penalty based on the depravity of the murder. The jury found the existence of the depravity aggravating circumstance, but returned a sentence of life without parole. Distinguishing Wright's crime from Robert's, Wright's victim was not an on-duty corrections officer, nor was Wright attempting to escape lawful confinement at the time. These facts alone separate Robert's offense from Wright's.

[¶33.] A proportionality review focuses not only on the crime, but also on the defendant. *Id.* Wright's jury considered mitigating factors not present in Robert's case. Wright had been deaf her entire life, struggled with sexual identity issues, and had attempted suicide several times. A psychological evaluation concluded that Wright read at a third-grade level, and suggested the possibility of brain damage.

[¶34.] None of the mitigating circumstances present in *Wright* are present here. Robert presents as an intelligent, college-educated man well able to function in society. He held a college degree from the University of Wisconsin and has held several long-term jobs. At the time of the 2006 Meade County kidnapping conviction, Robert had over $14,000.00 in his checking account, and over $200,000.00 in total assets available. Even though Robert was capable of functioning as a productive member of society, his past contains several instances of violent, abusive behavior.

[¶35.] Robert committed this crime while incarcerated for the 2005 kidnapping of a young woman. At the time of the kidnapping, Robert's vehicle contained rope, a shovel, and pornographic material. For the kidnapping, Robert received 80 years in prison.

[¶36.] Robert's violent history predates this murder and the kidnapping. At the pre-sentence hearing, the State elicited testimony from a person with whom Robert had had a long-term relationship. This testimony established that, before the kidnapping, Robert was a violent, abusive, sexually assaultive man, capable of violent acts against innocent victims. This witness testified that Robert physically assaulted her, including punching, tackling, and pointing a gun to her head. She also testified that Robert physically beat her until she acquiesced to sex. This testimony is relevant because, as noted, the excessiveness and proportionality inquiry focus not only on the crime, but also the defendant.[15]

[¶37.] This case presents the second time that a capital sentencing phase has been conducted based on the potential applicability of SDCL 23A-27A-1(7) ("The offense was committed against a law enforcement officer, employee of a corrections institution, or firefighter while engaged in the performance of such person's official duties."). In *State v. Bittner*, Bittner stabbed two police officers responding to a call

---

15. In his reply brief, Robert argues that because he agreed the death penalty was a proper sentence, the testimony concerning his past behavior was irrelevant. But Robert's decision to accept the death penalty is the irrelevant fact in the sentencing determination, not his history. As previously noted, if the only relevant consideration were Robert's decision to accept and even seek execution, this State would be assisting his suicide, rather than constitutionally imposing the most severe criminal sanction available.

that Bittner physically assaulted his girlfriend. One of the officers died. The jury did not find the existence of any aggravating circumstances. Bittner established various mitigating circumstances, including the use of alcohol immediately prior to the crime and a disavowal of any intent to deliberately kill the officer. Bittner received life in prison.

[¶38.] At the time of this crime, Robert was an inmate in the penitentiary. Alcohol played no role in this killing. Nor has Robert disavowed his intent to kill Johnson. Rather, Robert confessed his intent to kill not only Johnson, but any other correctional officer standing in his way of escape. The nature of Johnson's injuries supports Robert's professed intent to kill Johnson. Robert's escape attempt relied on immobilizing Johnson and stealing his uniform. But the intensity of the beating and use of the plastic wrap prove that Robert intended to assure Johnson's death, even if immobilization would have sufficed. Robert's sobriety and intent to kill Johnson set this case apart from Bittner's. Robert's death sentence is not disproportionate to the life sentence Bittner received.

[¶39.] The case of Darrell Hoadley also presents a horrendous beating death. Hoadley received a life sentence from a jury after co-defendants Page and Piper both received death sentences from a judge.[16] In considering the proportionality of Piper's death sentence to co-defendant Hoadley, we noted that Hoadley's involvement distinguished the sentences of Piper and Page. "South Dakota

---

16. This Court reversed Piper's death sentence in *Piper v. Weber*, 2009 S.D. 66, 771 N.W.2d 352. Piper was later sentenced to death by a jury. Piper has appealed the jury's death sentence to this Court, which appeal is currently pending. *State v. Piper*, #26126.

reenacted the death penalty in 1979. Since that time, only defendants Moeller, Rhines, and Anderson have approached the sheer brutality exhibited by Piper and his co-defendant Page, and all have received the death penalty. Piper and Page jointly planned the murder scheme and it was only after it was agreed upon between them did they so inform Hoadley and involve him in its execution." *Piper*, 2006 S.D. 1, ¶ 39, 709 N.W.2d at 801. This was not merely an escape attempt on the spur of the moment where events spiraled out of control. Here, the record reflects that Robert had been planning his escape attempt, which included the murder of a corrections officer, for well over a month. His planning stage included obtaining the lead pipe eventually used to kill Johnson.

[¶40.]    The combination of the record concerning the crime and defendant satisfy this Court that Robert's death sentence is neither excessive nor disproportionate when compared to the applicable universe of cases.

Conclusion

[¶41.]    The circuit court did not base its sentencing decision on any passion, prejudice, or any other arbitrary factor. The evidence supports the aggravating circumstances found by the circuit court, and the death sentence is neither disproportionate nor excessive when compared to other South Dakota cases in which a capital sentencing phase was conducted. The death sentence is affirmed. This matter is remanded to the circuit court for entry of a warrant of execution pursuant to SDCL 23A-27A-31.

[¶42.]    Affirmed.

[¶43.]     KONENKAMP, ZINTER, and SEVERSON, Justices, and MILLER,

Retired Justice, concur.

[¶44.]     MILLER, Retired Justice, sitting for WILBUR, Justice, disqualified.