#26126-a-LSW

**2014 S.D. 2**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

BRILEY W. PIPER,                    Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE JEROME A. ECKRICH, III
Judge

\* \* \* \*

MARTY J. JACKLEY
Attorney General

PAUL S. SWEDLUND
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff
and appellee.

STEVE MILLER
Sioux Falls, South Dakota                    Attorney for defendant
and appellant.

\* \* \* \*

ARGUED ON MARCH 18, 2013

OPINION FILED **01/08/14**

#26126

WILBUR, Justice

[¶1.]        Briley Piper pleaded guilty to several offenses, including felony murder. The plea-taking court sentenced Piper to death on the murder charge. This Court affirmed Piper's death sentence. Piper then sought habeas relief claiming that he did not validly waive his right to have a jury determine whether to impose the death penalty. This Court granted Piper's writ of habeas corpus and vacated his death sentence. Once the case was remanded to the circuit court for a jury sentencing procedure, Piper filed a motion to withdraw his guilty pleas, which the circuit court denied on the merits. The case proceeded to a jury sentencing. The jury found the existence of three aggravating factors and sentenced Piper to death. Piper appeals the denial of his motion to withdraw his guilty pleas and the proportionality of his sentence. We affirm.

### FACTS AND PROCEDURAL HISTORY

[¶2.]        In 2000, Piper was charged with five offenses, including the murder of Chester Allan Poage.[1] On January 3, 2001, Piper appeared before Judge Warren G. Johnson (the plea-taking court) and pleaded guilty to the charges of first-degree felony murder, kidnapping, first-degree robbery, first-degree burglary, and grand theft. After accepting Piper's guilty pleas to the charged offenses, the court held a three-day sentencing hearing, and ultimately sentenced Piper to death.[2]

---

1.    For a full recitation of the underlying facts of this case, see this Court's opinion in *State v. Piper* (*Piper I*), 2006 S.D. 1, ¶¶ 2-11, 709 N.W.2d 783, 790-92.

2.    In separate proceedings, Piper's co-defendant, Elijah Page, pleaded guilty to the same charges and was sentenced to death by the same judge. Another co-
(continued . . .)

-1-

[¶3.]      This Court affirmed Piper's conviction and sentence in *State v. Piper* (*Piper I*), 2006 S.D. 1, 709 N.W.2d 783.  Piper then filed an application for writ of habeas corpus claiming that he did not validly waive his right to have a jury determine whether to impose the death penalty.  The habeas court denied the application and Piper appealed that decision.

[¶4.]      In *Piper v. Weber* (*Piper II*), we noted that the plea-taking court did not explain to Piper that if the jury was not unanimous in its decision to impose the death penalty, then Piper would receive a life sentence.  2009 S.D. 66, ¶ 17, 771 N.W.2d 352, 358.  We reversed the habeas court and held that Piper did not validly waive his right to have a jury determine whether to impose the death penalty.  *Id.* ¶ 21, 771 N.W.2d at 360.  Thus, we "vacate[d] Piper's death sentence and remand[ed] for a new sentencing proceeding that afford[ed] Piper the right to have a jury decide whether the death penalty should be imposed." *Id.*

[¶5.]      Upon remittal and prior to his new sentencing hearing, Piper filed the motion that is the subject of this appeal—a motion to withdraw his guilty pleas for felony murder and the other four non-capital offenses.  In his motion, Piper argued that his guilty pleas were not knowing and voluntary because the plea-taking court failed to advise Piper of his purported right to have a jury determine guilt on all of the underlying charges and then to have a sentencing hearing before the circuit court.  Piper also alleged that the plea-taking court failed to advise him that he

_____

(. . . continued)
    defendant, Darrell Hoadley, maintained a not guilty plea to the same charges
    and proceeded to a jury trial.  The jury convicted Hoadley, but did not impose
    the death penalty.

#26126

could receive consecutive sentences upon his convictions for kidnapping, robbery, burglary, and grand theft.

[¶6.]     After conducting a motion hearing and familiarizing himself with the contents of the parties' submissions and both files in *Piper I* and *Piper II*, Judge Jerome A. Eckrich III (the circuit court) denied the motion on the merits. The case proceeded to a jury sentencing hearing in July 2011. The jury returned a unanimous verdict finding the existence of three aggravating circumstances pursuant to SDCL 23A-27A-1(3), (6), and (9) and unanimously recommended that a death sentence be imposed.

[¶7.]     In addition to this Court's automatic review of the death sentence pursuant to SDCL 23A-27A-9, Piper raises two issues. We review the issues presented in the following order:

1.   Whether Piper's motion to withdraw his guilty pleas was improperly denied.

2.   Whether Piper's sentence was lawfully imposed under SDCL 23A-27A-9 and SDCL 23A-27A-12.[3]

**DECISION**

[¶8.]     **1.   Whether Piper's motion to withdraw his guilty pleas was improperly denied.**

[¶9.]     Statute, refined by case law, grants this Court broad authority to narrow the scope of further proceedings when judgment is remitted to the circuit

_____

3.   Piper's second presented issue ("[Whether] Piper's death sentence is disproportionate to the life sentence imposed on co-[d]efendant Hoadley") is part and parcel of our proportionality analysis and is considered here.

-3-

court.[4] SDCL 15-30-14 provides that "[i]n all cases the Supreme Court shall remit its judgment or decision to the court from which the appeal was taken, *to be enforced accordingly*; and if from a judgment, final judgment shall thereupon be entered in the court below in accordance therewith, except where otherwise ordered." (Emphasis added.) *See* SDCL 15-30-11 ("[T]he settled record on appeal shall be remitted to the court from which the appeal was taken, and further proceedings shall be had *in accordance therewith*.") (emphasis added), 23A-32-19 ("The Supreme Court by its judgment may reverse, affirm, or modify the judgment or order appealed from . . . ."). *See also* SDCL 23A-32-14 (civil appellate procedure applies to criminal appeals unless otherwise provided).

[¶10.]    Taken together, these statutes establish that the scope of the circuit court's jurisdiction must conform to the dictates of our opinion. Indeed, in anticipation of this deference, we release our jurisdiction when the remittitur is returned to the circuit court, except in the narrow circumstances of "fraud, mistake, or inadvertence." *Bahlkow v. Preston*, 62 S.D. 36, 251 N.W. 299, 299-300 (1933). If the circuit court's original jurisdiction could spontaneously resurrect on remittal, the defined roles of our tiered judicial system—as set forth in statute and case law—and the judicial certainty and efficiency they foster would be nullified.[5]

---

4.    Whether a circuit court conformed to our mandate is a question subject to de novo review. *See Weins v. Sporleder*, 2000 S.D. 10, ¶ 10, 605 N.W.2d 488, 490.

5.    The United States Supreme Court examined the ramifications of a lower court departing from the mandate given on appeal and concluded:

(continued . . .)

[¶11.]     Our directives on remittal are clear on the face of our opinions. If we affirm, the circuit court shall enter final judgment. *See* SDCL 15-30-14, 23A-32-19. Where we order reversal without any qualification, as in a general remand, "[t]he mandate . . . nullifies the judgment, findings of fact, and conclusions of law, and *leaves the case standing as if no judgment or decree had ever been entered."* *Gluscic v. Avera St. Luke's*, 2002 S.D. 93, ¶ 20, 649 N.W.2d 916, 920 (quoting *Janssen v. Tusha*, 67 S.D. 597, 601, 297 N.W. 119, 120 (1941)). Between these two extremes is the limited remand, for which our instructions must exactly govern. "When the scope of remand is limited, the entire case is not reopened, but rather, the lower tribunal is only authorized to carry out the appellate court's mandate." *In re Conditional Use Permit Granted to Van Zanten*, 1999 S.D. 79, ¶ 13, 598 N.W.2d 861, 864 (citing 5 Am. Jur. 2d *Appellate Review* § 787 (1995)). This procedure mirrors that performed by the United States Supreme Court: "[W]hen the direction

_____

(. . . continued)

> Argument to show that a subordinate court is bound to proceed in such an event and dispose of the case as directed . . . is unnecessary, as any other rule would operate as a repeal of the Constitution and the laws of Congress passed to carry the judicial power conferred by the Constitution into effect.

*Tyler v. Magwire*, 84 U.S. 253, 282-83, 21 L. Ed. 576 (1872). The integrity of a hierarchical system of appellate review is not something to be lightly cast aside. As the Fourth Circuit Court of Appeals explained:

> The principle of hierarchy is no empty shell. It protects the very value and essential nature of an appeal, namely the chance afforded litigants for review of a judgment and for correction, generally by a larger judicial body, of errors that may have serious consequences or work significant injustice.

*Doe v. Chao*, 511 F.3d 461, 465 (4th Cir. 2007).

contained in the mandate is precise and unambiguous, it is the duty of the [lower court] to carry it into execution, and not to look elsewhere for authority to change its meaning." *West v. Brashear*, 39 U.S. 51, 54, 10 L. Ed. 350 (1840).

[¶12.]     We strictly and purposely limited our remand instructions in *Piper II* to correct the specific error that had occurred—the denial of a jury at sentencing. In *Piper II*, we "vacate[d] Piper's death sentence and remand[ed] for a new sentencing proceeding that afford[ed] Piper the right to have a jury decide whether the death penalty should be imposed." *Piper II*, 2009 S.D. 66, ¶ 21, 771 N.W.2d at 360. As evidenced by authorities cited in the opinion, namely *State v. Apple*, 2008 S.D. 120, ¶¶ 22-23, 759 N.W.2d 283, 291, and *State v. Goodwin*, 2004 S.D. 75, ¶ 18, 681 N.W.2d 847, 854, we were aware of the possibility of remanding the case to the circuit court for the explicit purpose of permitting Piper to withdraw his guilty pleas. Yet, we unanimously did not give that instruction. This was because, as both the circuit court and Piper acknowledged, the sufficiency of Piper's admission of guilt was not before us in *Piper II*, and our limited scope of remand was written accordingly.

[¶13.]     In spite of this fact, however, the circuit court considered Piper's motion to withdraw his guilty pleas and denied it on the merits. This was in excess of what was permitted by our limited remand. Rather, the circuit court should have denied the motion to withdraw on the basis of the limited nature of the remand. The circuit court reached the correct result—denial of the motion to withdraw— albeit for the wrong reason. *See, e.g., State v. Hart*, 1998 S.D. 93, ¶ 43, n.9, 584 N.W.2d 863, 871 n.9; *Kehn v. Hoeksema*, 524 N.W.2d 879, 880-81 (S.D. 1994)

(affirming the decision of the circuit court because it reached the right result for the wrong reason). Thus, we affirm the denial of the motion and decline to address the merits of Piper's request to withdraw his pleas as being beyond the scope of our remand in *Piper II*.

[¶14.] **2. Whether Piper's sentence was lawfully imposed.**

[¶15.] "In every case [in South Dakota] where the death penalty is imposed, this Court is required to conduct an independent review of the sentence." *Piper I*, 2006 S.D. 1, ¶ 26, 709 N.W.2d at 797 (citing SDCL 23A-27A-9). We must decide:

> (1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and
> (2) Whether the evidence supports the jury's . . . finding of a statutory aggravating circumstance as enumerated in § 23A-27A-1; and
> (3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

SDCL 23A-27A-12.[6]

[¶16.] **Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.**

[¶17.] Piper's death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. SDCL 23A-27A-12(1). The jury received relevant evidence regarding the impact of the crime on Poage's mother and sister,

---

6. Piper raises only one argument concerning the lawful imposition of the death sentence by the jury. He argues that, because co-defendant Hoadley testified at the July 2011 sentencing hearing that Piper played a less active role in the murder, Piper's sentence is now internally disproportionate to Hoadley's life sentence. Because our review of the imposition of the death sentence is mandatory under SDCL 23A-27A-9, our review must consist of an examination of all three statutory factors contained within SDCL 23A-27A-12, including the proportionality of Piper's sentence.

Piper's history, and evidence of aggravating and mitigating circumstances.  Our review of the record contains no independent basis to invalidate the sentence due to the influence of passion, prejudice, or any other arbitrary factor.

[¶18.]	**Whether the evidence supports the jury's finding of a statutory aggravating circumstance as enumerated in § 23A-27A-1.**

[¶19.]	There is evidence in the record from Piper's sentencing hearing that supports the jury's finding of three aggravating circumstances beyond a reasonable doubt.  SDCL 23A-27A-12(2).  *See* SDCL 23A-27A-1(3), (6), & (9).  "In order to be eligible for the death penalty, one of the . . . aggravating circumstances [enumerated] in SDCL 23A-27A-1 must be found beyond a reasonable doubt."  *Piper I*, 2006 S.D. 1, ¶ 28, 709 N.W.2d at 797.

[¶20.]	In this case, the jury found the existence of three aggravating circumstances beyond a reasonable doubt pursuant to SDCL 23A-27A-1(3), (6), and (9).  The jury determined the State proved beyond a reasonable doubt that Piper "committed the offense for the benefit of [himself] or another, for the purpose of receiving money or any other thing of monetary value" pursuant to SDCL 23A-27A-1(3).  The record demonstrates the jury was presented with evidence that Piper, Page, and Hoadley killed Poage for the purpose of stealing items from Poage's house.  Piper and Page initially formed the plan to rob Poage and later informed Hoadley of their plan.  After brutally murdering Poage, the trio returned to the Poage home and stole electronics, antique watches, coin collections, and other items of limited value.  Piper, Page, and Hoadley fled South Dakota in Poage's Chevrolet Blazer.  They obtained Poage's ATM card and pin number and successfully withdrew money from Poage's bank account following Poage's murder.

[¶21.]	Additionally, the jury found that the State proved beyond a reasonable doubt that "the offense was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or custody in a place of lawful confinement" pursuant to SDCL 23A-27A-1(9). The jury heard Piper's statements to law enforcement during two interviews on April 28, 2000. From these statements, it can be gleaned that Piper, Page, and Hoadley killed Poage in order to eliminate Poage as a witness to the robbery—the objective of the whole scheme that evening.

[¶22.]	Furthermore, Piper and his co-defendants transported Poage to a wooded, sparsely-populated, and rugged location, where they murdered Poage and disposed of his body. Testimony at the sentencing hearing indicated that the nearest house to the location where Poage's body was recovered was approximately 2.85 miles away. There was evidence in the record that, immediately following the murder and the ransacking of the Poage home, Piper and his co-defendants left South Dakota and went to Piper's sister's home in Missouri. Prior to their return to Rapid City, the group pawned many of Poage's possessions and utilized his ATM card at several locations in Nebraska and South Dakota. When taken as a whole, there is sufficient evidence to support the jury's finding beyond a reasonable doubt the alleged aggravating circumstances under SDCL 23A-27A-1(9).

[¶23.]	The jury also found that "the offense was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim" under SDCL 23A-27A-1(6). Depravity of the mind is defined as:

> (1) the defendant committed torture upon the living victim; (2) the defendant subjected the body of the deceased victim to

mutilation or serious disfigurement; (3) the defendant relished the murder; (4) the defendant inflicted gratuitous violence upon the victim; (5) the senselessness of the crime; or (6) the helplessness of the victim.

*Piper I*, 2006 S.D. 1, ¶ 30, 709 N.W.2d at 799 (quoting *State v. Rhines* (*Rhines I*), 1996 S.D. 55, ¶ 143, 548 N.W.2d 415, 448). The other terms of SDCL 23A-27A-1(6) are defined as:

> Torture requires: (1) the unnecessary and wanton infliction of severe pain, agony, or anguish; and (2) the intent to inflict such pain, agony or anguish . . . . Unnecessary pain implies suffering in excess of what is required to accomplish the murder. Aggravated battery requires the infliction of serious physical abuse upon the victim, by depriving him of a member of his body, or by rendering a member of his body useless, or by seriously disfiguring his body or a member thereof . . . and by proving specific intent to inflict unnecessary pain in excess of what was required to accomplish the murder.

*Piper I*, 2006 S.D. 1, ¶ 30, 709 N.W.2d at 799 (internal citations and quotation marks omitted).

[¶24.] The jury was presented with evidence that, after Page pointed a pistol at Poage and ordered Poage to the floor, Piper kicked Poage in the face hard enough to render Poage unconscious. Piper then watched as his co-defendants bound Poage's hands and feet and placed him upright in a chair. Piper stood on a four-way tire iron on Poage's feet to prevent him from moving. Poage was forced to drink a concoction of crushed up pills, beer, and hydrochloric acid. And all the while Poage pleaded for an explanation as to why the men were harming him.

[¶25.] Next, the trio ushered Poage to his Blazer, placed Poage in the backseat, and threatened to kill him if he tried to escape. Piper drove the group in Poage's Blazer to Higgins Gulch.

[¶26.]     Once at Higgins Gulch, Poage was forced, in freezing temperatures and 12-inches of snow, to strip his body of his clothing, except for his shoes, socks, and undershirt. From the evidence, Poage endured their attempt to bury him in the snow and to drown him in the ice-cold waters of the creek. Poage was repeatedly kicked, which caused disfiguring injuries to Poage's ears and head. Piper admitted to law enforcement that he kicked Poage multiple times in his head and body while wearing combat-style boots. When Poage attempted to make an escape from the men, Piper ordered Page to chase Poage. The jury heard evidence that Poage asked to warm himself inside the Blazer, but the group refused to allow Poage to enter the vehicle because he was bleeding. Following instructions, Poage went to the ice-cold creek and washed his body. However, after complying with his captors' demands, Poage was not allowed into the vehicle. Later, Page and Hoadley dropped large stones on Poage's head, while Piper stood by and did nothing to aid a helpless Poage. Throughout the events of that evening, Poage pleaded with the co-defendants offering all of his possessions to the group in exchange for his life.

[¶27.]     For the first time in open court at the sentencing hearing, Piper presented evidence that he took part in stabbing Poage.[7] Dr. Dewey Ertz, a licensed psychologist who examined Piper on two occasions, testified on direct examination by defense counsel:

> **Q:** Did [Piper] tell you whether or not he had stabbed Chester Poage?

---

7.     In the opening statement, counsel for Piper stated, "And this is something else that I believe this evidence will show here, is that [Piper] did stab Chester Poage. That's not something that's been established before. Now we admit that."

**A:** He told me that he had.

**Q:** Now, that wasn't something that was in his interview that you viewed with the police officers.

**A:** No, it was not.

Evidence presented at the sentencing hearing revealed that Poage was stabbed three times in his head and neck.

[¶28.] The jury was presented with evidence that Poage's murder involved "gratuitous violence." Indeed, Piper admitted to law enforcement that he taunted and laughed at the victim throughout the four-hour ordeal.

[¶29.] Furthermore, the crime was senseless in that Piper and his co-defendants gained little, monetarily, after Poage offered all of his possessions in exchange for his life. Based on the evidence presented at the sentencing hearing, there is sufficient support for the jury's finding beyond a reasonable doubt the alleged aggravating circumstance under SDCL 23A-27A-1(6).

[¶30.] Under SDCL 23A-27A-1, the judge "shall include in instructions to the jury for it to consider[ ] any mitigating circumstances[.]" SDCL 23A-27A-2, the presentencing hearing statute, mandates "[a]t such hearing the jury shall receive all relevant evidence, including . . . (4) [a]ll evidence concerning any mitigating circumstances." At the sentencing hearing, the jury was presented with the following mitigating evidence. As a child, Piper was involved in Boy Scouts, swimming, football, and martial arts. Piper had problems socializing at school, was impulsive, was diagnosed with Attention Deficit and Hyperactive Disorder, and had other learning issues. Following graduation, Piper began college at the University of Alaska at Anchorage, but eventually dropped out. And, while in prison, Piper completed 42 college credit hours through Ohio University and was baptized into

the Catholic faith.  Lastly, Piper provided a statement at the end of the sentencing hearing apologizing to both the Poage family and his own family.[8]

[¶31.] **Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.**

[¶32.] Finally, Piper's death sentence is not excessive or disproportionate compared to the penalty imposed in similar cases when considering the nature of the crime and extent of Piper's actions.  SDCL 23A-27A-12(3).

> [S]imilar cases for purposes of SDCL 23A-27A-12(3) are those cases in which a capital sentencing proceeding was actually conducted, whether the sentence imposed was life or death.  Because the aim of proportionality review is to ascertain what other capital sentencing authorities have done with similar capital murder offenses, the only cases that could be deemed similar . . . are those in which imposition of the death penalty was properly before the sentencing authority for determination.

*State v. Robert*, 2012 S.D. 60, ¶ 28, 820 N.W.2d 136, 145 (quoting *Rhines I*, 1996 S.D. 55, ¶ 185, 548 N.W.2d at 455-56) (internal quotation marks omitted).  "For

---

8.	Piper stated in court:

> I'm here because I'm responsible for the death of Allan Poage, and that's a responsibility that I'm going to pay for for the rest of my life.  When I did this I was very young, and if there was anything that I could do to change what I did that night I would do it.
>
> To Mrs. Poage, to you and your loved ones, I am so very sorry for what I have done to your son and for what this has done to you.  I know I will never deserve your forgiveness.
>
> To my mom and dad, what I have done I'll never be able to make up to you.  The shame that I brought to you, and the fact that you still both love me is my greatest blessing.
>
> I owe so many other apologies, ones that I'll never be able to make.  And I am so sorry for what I did.

purposes of comparative proportionality review, 'a death sentence is comparatively excessive if other defendants with similar characteristics generally receive sentences other than death for committing factually similar offenses in the same jurisdiction.'" *State v. Berget*, 2013 S.D. 1, ¶ 21, 826 N.W.2d 1, 12 (quoting *Rhines I*, 1996 S.D. 55, ¶ 205, 548 N.W.2d at 457). We have previously recognized that "[t]he disparity in suffering endured by victims is an important and legitimate consideration when evaluating the proportionality of a death sentence." *Rhines I*, 1996 S.D. 55, ¶ 207, 548 N.W.2d at 458.

[¶33.]     Piper raises only one argument concerning the proportionality of his sentence. Piper asserts that his sentence is internally disproportionate; i.e., disproportionate to the life sentence a jury gave to Piper's co-defendant Hoadley. Piper is asking this Court to revisit its earlier proportionality ruling in *Piper I* in light of Hoadley's new testimony at the July 2011 sentencing hearing, which portrayed Piper as more of a bystander in the murder than an active participant. *See* 2006 S.D. 1, ¶¶ 69-96, 709 N.W.2d at 810-18. Piper now argues that Hoadley testified under oath and was subject to cross-examination, which, Piper contends, was the reason this Court gave in *Piper I* for not considering Hoadley's out-of-court statements.

[¶34.]     We again rely on Piper's own statements—to law enforcement, to friends, to cellmates, and to medical professionals—as to the degree of Piper's involvement in the crime. Though Hoadley's recent version indicates that Piper had minimal involvement with the events at the gulch, Hoadley earlier told a different version of events detailing Piper's active involvement in the crime to friend-turned-

police-informant Danny Burkhart.[9]  Hoadley's current version of events was testified to 11 years after the murder while Hoadley's statements to Burkhart occurred shortly after the murder.  And, at Piper's sentencing hearing in July 2011, Hoadley admitted that in making his statements to Burkhart, he had "no motiv[e] to make up [a] story at that time[.]"

[¶35.]        From the evidence presented at the sentencing hearing, excluding Hoadley's testimony, Piper's degree of involvement in Poage's murder was not equal to co-defendant Hoadley's involvement.  "'[A] death sentence should not be invalidated simply because a jury determined that another defendant, who committed an analogous crime, deserved mercy.'"  *Id.* ¶ 96, 709 N.W.2d at 818 (quoting *Rhines I*, 1996 S.D. 55, ¶ 206, 548 N.W.2d at 457).  Piper and co-defendant Page initially formed the plan to rob Poage and it was not until later that they informed Hoadley of their plan.  Piper kicked Poage in the head rendering Poage unconscious.  Piper held Poage's feet down with a tire iron while Page forced Poage to drink a toxic liquid.  During these events, Piper indicated to law enforcement that Hoadley was a bystander.  Piper drove the group to Higgins Gulch in Poage's Blazer.  There is evidence in the record that Piper kicked Poage several times in the head and body at the gulch and taunted Poage.  Piper presented evidence at the sentencing hearing that he did take part in the stabbing of Poage.  Because Piper's level of involvement in the crime itself was greater than co-defendant Hoadley's

---

9.     The statements that Hoadley made to Burkhart occurred prior to Hoadley's arrest and were tape recorded.

involvement, Piper's death sentence is not internally disproportionate to co-defendant Hoadley's life sentence.

[¶36.] Piper's sentence is proportionate when compared to the penalty imposed in similar cases when considering the nature of the crime and extent of Piper's actions. This Court has recently updated the list of cases that are applicable to our proportionality review. *See Robert*, 2012 S.D. 60, ¶¶ 29-31, 820 N.W.2d at 145-46. We now review and include the summary of *State v. Robert* in our "universe" of cases for comparison and take judicial notice of the case summaries set forth in previous decisions. *See id.* (summarizing *State v. Wright*, 2009 S.D. 51, 768 N.W.2d 512, as a case where a jury, faced with a decision of whether to impose the death penalty, sentenced the defendant to life in prison and taking judicial notice of the "universe" of cases). *See also State v. Page*, 2006 S.D. 2, ¶ 60, 709 N.W.2d 739, 760-61 (taking judicial notice of co-defendant Piper's case and the case summaries set forth in *Rhines I* and in *Moeller II* and stating that co-defendant Hoadley's conviction was a case where the jury, faced with the decision of whether to impose the death penalty, imposed a life sentence); *Piper I,* 2006 S.D. 1, ¶ 38, 709 N.W.2d at 801 (taking judicial notice of co-defendant Page's case and the case summaries set forth in *Rhines I* and in *Moeller II* and stating that co-defendant Hoadley's conviction was a case where the jury imposed a life sentence); *Rhines I*, 1996 S.D. 55, ¶¶ 187-204, 548 N.W.2d at 456-57 (summarizing six cases where the jury imposed a life sentence and one case where the jury imposed a death sentence).[10]

---

10. The universe of cases in which a capital sentencing proceeding was conducted includes: *State v. Howard Adams*; *State v. Steven Bittner*; *State v. William J.*

(continued . . .)

[¶37.]    Eric Robert and his co-defendant, Rodney Berget, inmates at the South Dakota State Penitentiary, brutally assaulted correctional officer, Ronald Johnson, by striking him in the face and head with a lead pipe causing disfiguring injuries. *See generally Robert*, 2012 S.D. 60, 820 N.W.2d 136. The two men then wrapped Johnson's head in plastic wrap to prevent Johnson from crying for help and from breathing. Johnson died from the injuries he received in the attack. Following the attack, Robert and Berget dragged Johnson's lifeless body to a concealed area where Robert dressed himself in Johnson's uniform and Berget climbed into a box placed on a four-wheel cart. The men attempted to escape the prison. When they were unsuccessful, Robert and Berget surrendered to prison officials.

[¶38.]    Robert pleaded guilty to first-degree murder and opted to have a sentencing hearing before the circuit court instead of a jury. The circuit court found that the State had proved beyond a reasonable doubt the existence of two aggravating circumstances: the crime was committed against a law enforcement official and the crime was committed by a person in lawful confinement.

[¶39.]    At Robert's sentencing hearing, the court was presented evidence of Robert's violent and abusive past, including a kidnapping conviction, his rehabilitative prospects, and the severity and depravity of the crime. Even though Robert waived the presentation of mitigating evidence, the court considered the

_____

(. . . continued)
    *Helmer*; *State v. Donald Moeller*; *State v. James Elmer Smith*; *State v. Edwin Swallow*; *State v. David Waff*; *State v. Charles Russell Rhines*; *State v. Robert Leroy Anderson*; *State v. Darrell Hoadley*; *State v. Elijah Page*; *State v. Briley Piper*; *State v. Daphne Wright*; and *State v. Eric Robert*. Because we reversed Rodney Berget's death sentence in *State v. Berget*, 2013 S.D. 1, ¶ 119, 826 N.W.2d 1, 37, *Berget* is not considered in our "universe" of cases.

mitigating evidence it could find, including Robert's high intelligence, college degree from the University of Wisconsin, and his ability, because of his education and work history, to function as a productive member of society. The circuit court sentenced Robert to death.

[¶40.] Similar to the disfiguring injuries that Robert and his co-defendant inflicted upon Johnson, Piper and his co-defendants caused disfiguring injuries to Poage. Robert and his co-defendant delivered several blows to Johnson's head, which led to the exposure of Johnson's brain in at least three locations. In the present case, the evidence presented to the jury indicated that Poage had been kicked in his head to the point that his ears had been forcibly detached. Poage had also been stabbed several times in the head. Piper admitted to kicking Poage several times, once in the face at the Spearfish home, and then several more times in the head and body at the gulch. Piper presented evidence at trial that he took part in the stabbing. However, in contrast to the beating and ultimate killing of Johnson, the brutality and torture of Poage lasted several hours.

[¶41.] Piper was the first of the three men to direct an assault against Poage. The force with which Piper kicked Poage in the face was so hard that it rendered Poage unconscious. Following that attack, Piper held a tire iron to Poage's feet while co-defendant Page forced Poage to drink a toxic liquid. Piper drove the men in Poage's vehicle to the gulch. At the gulch, evidence in the record indicates that Piper kicked Poage several more times and stabbed him. During this time, Piper made jokes and comments as to the beatings and as to the amount of pain inflicted upon Poage at the hands of his co-defendants. The jury heard evidence that Poage

asked to warm himself inside the Blazer and the group refused to allow Poage to enter the vehicle because he was bleeding. Following instructions, Poage went to the ice-cold creek and washed his body. However, after complying, Poage was not allowed inside the vehicle. Throughout the evening, Poage begged for his life and repeatedly asked the men why they were hurting him. Lastly, in contrast to his statements of remorse at this sentencing hearing, Piper bragged when he told his friends and cellmate about the events of the evening.

[¶42.]     The mitigating evidence presented to the jury indicates that Piper had a relatively decent childhood. Piper was involved in Boy Scouts, sports, and martial arts. Similar to Robert, Piper had the opportunity to go to college and the record indicates that he did go to the University of Alaska at Anchorage for a short time following his graduation from high school.

[¶43.]     Perhaps, most important, the jury heard evidence of Piper's manipulative personality. Piper and co-defendant Page initially decided together to rob Poage and later told Hoadley of their idea. When Poage attempted to escape from his captors at the gulch, Piper instructed Page to run after him. Furthermore, during Piper's incarceration he exhibited his manipulative personality. When he was initially imprisoned, the jury heard evidence that Piper attempted to coerce other inmates to join his escape plot from the Lawrence County jail. The record also indicates Piper manipulated a nun by convincing her to write a letter to another incarcerated individual, a violation of prison policy.[11] Prison officials, who have

---

11.     In response to the State's question of whether the nun knew it was a violation of prison policy for an inmate to write another inmate, the nun

(continued . . .)

worked with Piper, Page, and Hoadley, testified that Piper had a leadership personality while Page and Hoadley were described as "followers." We conclude that Piper's death sentence is not excessive or disproportionate compared to other similar cases when considering the nature of the crime and extent of Piper's actions.

## CONCLUSION

[¶44.] We affirm the denial of Piper's motion to withdraw his guilty pleas, not on the merits as determined by the circuit court, but because of the limited nature of our remand in *Piper II*. In addition, Piper's death sentence was lawfully imposed by the jury. Thus, we affirm Piper's death sentence.

[¶45.] GILBERTSON, Chief Justice, and KONENKAMP, ZINTER and SEVERSON, Justices, concur.

---

(. . . continued)

testified "I - - I did not - - I did not think of it at the time, and now, yes, I know that is, but I - - when I wrote the letter I did not realize it."